UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

**RECEIVED**

OCT 1 9 2007

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

Ryan Poullard                          §
(Shangowande Ajanaa-Werepe),           §
                                       §
v.                                     §    Civil Action No.  07-836(JDB)
                                       §
FEDERAL BUREAU OF PRISONS.             §


### PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT IN RESPONSE TO DEFENDANT'S OPPOSITION TO PLAINTIFF'S MOTION TO SUPPLEMENT

#### BACKGROUND

On July 19, 2006, BOP staff at FCI Beaumont accused the plaintiff of several violations, many of which are utterly false in light of the documentary evidence presented to this honorable United States District Court.  BOP staff claims that the plaintiff acknowledged being the owner of several stacks of books and what appeared to be personal papers.  Compl. at Ex. E (Docket Entry 1).  However, inmate Cortez  who also shared plaintiff's cell, is said to have identified that "...all of the books and papers belonged to inmate Poullard."  Compl. at Exhibits F & G.  On top of these "several stacks of books and what appeared to be personal papers" is a book that bears the name "Cortez."  Compl. at Ex. J.  This book with Cortez's name on it establishes that all of the books and papers did not belong to inmate Poullard as alleged by BOP staff.

BOP staff further stated that the plaintiff refused to comply with their instructions to remove books and papers and alleged that the plaintiff expressed a need for an extra locker.  Plaintiff never requested an additional locker, and as established in section 17- Comments of Inmate to Committee Regarding Above Incident -of the incident report in question, plaintiff did not refuse to remove his books and papers.  Compl. at Ex. E.  Plaintiff did, however, refuse to remove his religious offerings from his locker because this order on the part of BOP staff put substantial pressure on the plaintiff to violate his sincerely held religious beliefs.  This fact was established by the plaintiff

in the following words:

> I can not determine what is to be used as an offering
> (contraband excluded) and neither can the chaplain, because
> **these determinations are made via divination.** This matter
> was clearly addressed on page 4 of my Ifa New and Unfamiliar
> Religious Components submittal (Attachment B of Plaintiff's
> Motion Requesting Permission to Supplement Original Pleading).

(emphasis added)  Compl. at Ex. C- Remedy ID # 425337-R1.

All determinations related to offerings in Ifa, including the removal of offerings, are made via divination.  The Ifa devotee must get God's approval through divination before removing offerings and BOP staff's order instructing the plaintiff to remove his religious offerings without this approval put a substantial burden upon the plaintiff to violate his beliefs.  On these grounds, plaintiff had no choice but to respectfully disobey BOP staff's intructions as they pertained to plaintiff's sincerely held religious beliefs.

The reporting BOP staff member alleges that when Counselor Gibbs opened plaintiff's locker, "...a foul smell came out of inmate Poullard's locker." This BOP staff member claims to have found several spoiled and malodorous food items.  Compl. at Ex. E.  Counselor Gibbs, who opened plaintiff's locker, and the other BOP staff member present at the time, did not notice any "foul smell" or "spoiled and malodorous food items."  These allegations by the reporting staff member, consequently, are questionable at the very least, in light of the Supporting Memorandums prepared by other BOP staff.  Compl. at Exhibits F & G.

Additionally, BOP staff claims to have determined that some of the books in plaintiff's cell belonged to other inmates and to the FCI Beaumont chaplain. Fifty books were confiscated from the plaintiff and in accordance with BOP policy, plaintiff established ownership of all fifty books.  Compl. at Ex. M.

-2-

Further, the FCI Beaumont Chaplain himself established in his August 8, 2006, response to plaintiff's Inmate Request to Staff that there were no books missing from the chapel. Compl. at Ex. L. Thus, the incident report in question is on its face completely unfounded in several of its allegations. In spite of these obvious contradictions, inconsistencies, and unsubstantiated allegations, plaintiff was subsequently punished for refusing to compromise his sincerely held religious beliefs.

Plaintiff's motion to supplement, contrary to the defendant's assertion in its opposition, can in fact survive a motion to dismiss and should therefore be granted. Moreover, as will be shown below, plaintiff is entitled to summary judgment in this action.

### ARGUMENT

I. **18 U.S.C. § 3625 does not preclude judicial review under the APA of plaintiff's claim regarding the provision of all materials and accommodations necessary for the practice of his sincerely held religious beliefs.**

In defendant's Motion to Dismiss sovereign immunity was invoked. 5 U.S.C. § 702 defeats the government's claim of sovereign immunity when relief other than monetary damages is sought in civil action. The Jurisdiction section of plaintiff's supplemental pleading cites both 28 U.S.C. § 1331 and 5 U.S.C. § 702, and the Exhaustion of Administrative Remedies section clearly separates the two issues raised in this case. Supp. Pl. at ¶¶ 2 & 4. 28 U.S.C. § 1331 is a sufficient and accepted jurisdictional ground for judicial review of prison disciplinary proceedings and 5 U.S.C. § 702 was not cited by the plaintiff for this particular issue.

5 U.S.C. § 702 was cited in plaintiff's complaint for two reasons: 1) to defeat defendant's claim of sovereign immunity and 2) to address the defendant's arbitrary rulemaking decisions related to several tenets that are central to the practice of plaintiff's sincerely held religious beliefs. One of these arbitrary decisions was presented to the court in plaintiff's Motion Requesting Permission

-3-

to Supplement Original Pleading.  On July 13, 2007, plaintiff was permitted to wear his Ide (beaded bracelet) and two Ileke's (beaded necklaces) in visitation. On July 23, 2007, plaintiff was denied entry into the visiting room for wearing the same religious beads that were worn on July 13, 2007.  The defendant terminated this visit and told the plaintiff's father that plaintiff had refused to see him.  Plaintiff was told on this date that his required religious beads could not be worn in visitation, or in any place in the institution except the chapel.

As will be discussed in Plaintiff's Motion Requesting a Standing Order From the Court, the defendant's rules regarding this central tenet of plaintiff's beliefs has been changed yet again, and the plaintiff is still not permitted to visit with his family and exercise his religious freedom at the same time.  The defendant insists that plaintiff must violate his beliefs in order "to maintain family ties, community relationships, and plan for release" via visitation.

Defendant has undoubedly exceeded its statutory authority and 18 U.S.C. § 3625 does not divest this court of jurisdiction to review whether the BOP has exceeded its statutory authority by whimsically and inconsistently making rules related to central tenets of plaintiff's faith.  Cf. Wajda v. U.S., 64 F.3d 385, 388 (8th Cir. 1995) (court retains jurisdiction to determine whether Parole Commission exceeded statutory authority notwithstanding lack of jurisdiction to review substantive decision).  "Accordingly, it is apparent that § 3625 precludes judicial review of agency adjudicative decisions but not of rulemaking decisions." Martin v. Gerlinski, 133 F.3d 1076, 1079 (8th Cir. 1998)

## II.  Plaintiff has stated cognizable First Amendment claim.

There are two threshold requirements that must be met before a particular belief, alleged to be religious in nature, can be accorded First Amendment protection.  Specifically, the beliefs avowed must be: 1) sincerely held and 2) religious in nature.  Levitan v. Ashcroft, 281 F.3d 1313, 1320 (D.C. Cir. 2002) (citing Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah, 508 U.S. 520,

531 (1993)). In June of 2004, plaintiff submitted his final draft of responses
to the defendant's New and Unfamiliar **Religious** Components Questionnaire.
(emphasis added) These responses, from the "official name" of plaintiff's
religion to the lay out of the Ifa all-natural vegetarian diet, constitute a
written statement of plaintiff's sincerely held religious beliefs. These responses,
from beginning to end, are clearly and unequivocally religious in nature.

On September 24, 2004, after the plaintiff had fully complied with the
defendant's New and Unfamiliar Religious Components procedure, plaintiff's religion
was officially approved. Plaintiff has been incarcerated since 1997 and plaintiff
maintained a perfect conduct record until his religion was "approved" by the
defendant. Six months after defendant's "approval," plaintiff's religious service
was interrupted, he was handcuffed in the middle of the chapel in front of his
fellow believers, and was locked in the Special Housing Unit for signing a chapel
sign-in sheet with both his religious and committed names (The Special Housing
Unit is a separate unit for inmates who are unable to function in a less restrictive
environment without being a threat to others or the orderly operation of the
institution. BOP Program Statement, 5212.07, Control Unit Programs, February 20,
2001). See Exhibit A. Plaintiff was sanctioned and a blemish was added to
plaintiff's spotless conduct record. See Exhibit B. Plaintiff did everything
in his power, short of kneeling down and saying "pretty please," to get this
unlawful blemish off his record but the defendant would not have it. Defendant
ignored the documentary evidence presented by the plaintiff to substantiate the
lawfulness of his actions and turned a deaf ear to his requests. See Exhibit C.
Defendant refused to process plaintiff's remedies for the same reasons that were
used to reject Remedy I.D. #'s 354786-F1, 355510-F1, 354786-R1, and 354786-A1.

Because plaintiff's back was against the proverbial "wall" and all other
doors had been slammed in his face, plaintiff had no choice but to file a civil
complaint in federal court. After the filing of said complaint, the defendant

miraculously realized that the plaintiff did in fact have a right to use both his religious and committed names. See Exhibit D. Another example of defendant's arbitrary rulemaking. On July 19, 2006, the same mortifying cycle described above reared its ugly head for the second time.

Plaintiff's sincerely held religious beliefs were approved under the "official name" Ifa. Defendant apparently felt that the name of plaintiff's religion was of no import and plaintiff's religion was later renamed by the defendant. This "renaming" forced plaintiff's religion into a category that ultimately denied him use of the outdoor worship area which was approved by the defendant. See Exhibit E. Because plaintiff did not have the needed outdoor space and shrines that were approved by the defendant, plaintiff had no choice but to use his locker as a substitute. Had the defendant provided access to an outdoor worship area as plaintiff requested in 2004-2005 via Remedy I.D. #'s 354786-F1, 355510-F1, 354786-R1, and 354786-A1, the July 19, 2006, incident included in this case would not have happened. Ergo, the defendant's "renaming" of plaintiff's religion and its resultant denial of access to an outdoor worship area violated, and continues to violate plaintiff's First Amendment rights.

## III. Plaintiff was discriminated against on the basis of religion.

For an equal protection claim to be validated in the prison context, an inmate who is not in a protected class must establish two necessary predicates. First, the inmate must establish that he or she was treated differently than other prisoners in his or her circumstances. Pryor-El v. Kelly, 892 F.Supp. 261 (D.D.C. 1995) (citing Brandon v. District of Columbia Bd. of Parole, 823 F.2d 644, 650 (D.C. Cir. 1987)). Second, he or she must establish that such treatment was the result of intentional or purposeful discrimination. Id.

As evidenced by response number 12 in plaintiff's New and Unfamiliar Religious Components submittal, an outdoor worship area is required for the practice of plaintiff's religion. See Attachment B of Plaintiff's Motion Requesting

-6-

Permission to Supplement Original Pleading at page 7. In September 2006, nearly two years after the official approval of plaintiff's religion, Staff Chaplain James Watanabe stated the following in an Inmate Request to Staff response:

> We are working closely with Mr. Awoyefa on the outdoor worship area. I cannot give you a time when it will be done, since **it is a work in progress.**
>
> (emphasis added)  See Exhibit F.

On November 15, 2006, in a response to a request for Ifa related administrative remedy, Deputy Warden Francisco J. Quintana stated that "...the Outdoor Worship Area is available for religious observances in accordance with policy." See Exhibit G. Plaintiff has never been granted access to any outdoor worhsip area for his religious practices and his January 2007 Informal Resolution Attempt incontestably establishes this fact. See Exhibit H. This attempt was completely ignored. It is apparent that the defendant, during this particular time period, had a rule in place which at least recognized the need for an outdoor worship area in the exercise of plaintiff's religion.

In response to a March 2007 Inmate Request to Staff, Chaplain Watanabe stated that "The Bureau of Prisons follows applicable policies without regard to race, color, nationality, **or ordinarily creed.**" (emphasis added) See Exhibit I. On May 2, 2007, Chaplain Watanabe contradicted Deputy Warden Quintana's November 2006 Response to Request for Administrative Remedy (Exhibit G), and his own September 2006 Response to Inmate Request to Staff (Exhibit F), by stating that "There is no known requirements for use of the Outdoor Worship Area in Santeria/Yoruba" (Exhibit E). Yet another example of the defendant's flip-flopping and capricious rulemaking.

Incarcerated Jewish, Native American, and Wiccan believers are in the same circumstances as the plaintiff, however, they are provided with outdoor worship space. Plaintiff, and his fellow believers in Ifa, are not allowed to use outdoor

worship space.  According to Chaplain Watanabe, this denial is based solely upon "creed."  This is a perfect example of intentional and purposeful discrimination, and "exceptionally clear proof" of defendant's violation of plaintiff's Equal Protection rights.  This violation on the part of the defendant continues to date.

On September 24, 2004, the same date that plaintiff's religion was approved, the defendant also approved the introduction of the "House of Yahweh."  In the same way that "Ifa" is used on plaintiff's approval letter, "House of Yahweh" is used on this second letter prepared by the defendant.  See Exhibit J.  However, when these newly approved religions were added to the chapel's schedule, the defendant intentionally treated one religion in a far less respectful manner than the other.  The defendant's January 26, 2005, chapel schedule listed "House of Yahweh" as it was listed in the September 24, 2004 approval letter.  Plaintiff's religion, on the contrary, was listed with a name that is not on his approval letter.  See Exhibit K.  Defendant apparently made a rule that changed the name of plaintiff's religion from Ifa to "Yoruba/Santeria."  The information used to make this rule did not come from plaintiff's Responses to New and Unfamiliar Religious Components Questionnaire.

On March 13, 2005, defendant changed the name of plaintiff's religion again. This time it was changed to "General Yoruban Program," a name that is found nowhere in the defendant's September 24, 2004, approval letter or plaintiff's New and Unfamiliar Religious Components submittal.  See Exhibit L.  Please note that the "House of Yahweh" is still the "House of Yahweh."  A new "name" rule obviously took effect which only applied to plaintiff's religion.  This shape shifter rulemaking leaves the plaintiff to wonder what his religion will be called next.

Again, incarcerated House of Yahweh believers are in the same circumstances as the plaintiff, with the exception that their religion is addressed by its proper name.  Plaintiff, and his fellow believers, have to endure  disrespectful

misnomers.  This name changing cannot be based on the language in defendant's

approval letter or plaintiff's New and Unfamiliar Religious Components submittal

and it is therefore clear-cut discrimination.  Intentional or purposeful

discrimination equals Equal Protection violation.  This violation on the part

of the defendant continues to date.

**IV.  Plaintiff has exhausted his administrative remedies.**

    The Prison Litigation Reform Act of 1995 provides that:

> No action shall be brought with respect to prison
> conditions under § 1983 of this title, or any other
> federal law, by a prisoner confined in any jail, prison,
> or other correctional facility until such administrative
> remedies as are available are exhausted.

To exhaust remedies in the federal prison system, an inmate must seek

review of his complaint at the institution, regional and central office levels.

Once an inmate has filed at each of these levels, the inmate is considered to have

exhausted all available administrative remedies.  28 C.F.R. § 542.15(a).  Also,

Wardens, Regional Directors, and the General Counsel have a responsibility to

**respond to all Requests or Appeals filed at their levels.**  (emphasis added)

28 C.F.R. § 542.11 (a)(4).  Last but not least, discrimination on the basis of

religion which denies an inmate access to any BOP program is strictly prohibited.

28 C.F.R. § 551.90.  Administrative remedies are one such BOP program.  <u>See</u>

Exhibit M.

    In defendant's Opposition to Plaintiff's Motion to Supplement, Administrative

Remedy "Specialist" James Schluter stated the following:

> The administrative remedy process commences with the
> inmate informally presenting a complaint to a staff member
> at the facility where he or she is housed.  Defendant's Opp.
> at Ex. 1, ¶ 3.

    It appears that the defendant's "Specialist" is attempting to make the

court believe that informal resolution is the only way to commence the

administrative remedy process. Not so. The "Specialist" cites 28 C.F.R. § 542.13
(a) in his declaration but 28 C.F.R. § 542.13 (b), which was not mentioned by
the "Specialist," establishes two alternative methods for commencing the administrative
remedy process. The second alternative reads thus:

> An informal resolution attempt may be waived in
> individual cases at the Warden or institution Administrative
> Remedy Coordinator's discretion when the inmate demonstrates
> an acceptable reason for bypassing informal resolution. Id.

The defendant's own policy states that "...the Warden may waive informal
resolution for Unit Discipline Committee (UDC) appeals, **or when informal resolution
is deemed inappropriate due to the issue's sensitivity.**" P.S. 1330.13, page 4
at (7)(b). (emphasis added)

On Friday 10/08/04, in accordance with the provisions of 28 C.F.R. § 542.13
(b), plaintiff submitted Remedy I.D. # 354786-F1 at the institution level. Supp.
Pl. at Remedy I.D. # 354786-R1. On Wednesday 10/13/04 this Request for Administrative
Remedy was rejected for one reason; "You did not sign your Request or Appeal." Id.
at Attachment B. The "Remarks" on this rejection stated, "You must sign your
name correctly; you should not address yourself as AKA nor Bro., etc." Id. The
photocopy of Remedy I.D. # 354786-F1 that was submitted to this court by the
plaintiff indisputably establishes that plaintiff's Request for Administrative
Remedy was in fact signed. Supp. Pl. at Remedy I.D. # 354786-F1. Defendant's
10/13/04 "remarks" also prove that this submittal was signed at the time of filing.
Note that this remedy was not rejected for any reason related to informal resolution.

For a "proper" filing of an Administrative Remedy or Appeal, the inmate must
complete the form with all requested identifying information and must date and
sign the form. 28 C.F.R. 542.14 (c)(3) & (4). Clearly, plaintiff fulfilled
each of these requirements to the letter. Supp. Pl. at Remedy I.D. # 354786-F1.
However, the defendant wanted plaintiff to do more than the law required him to

do. For example, defendant's "Specialist" states, "SENTRY indicates remedy number 354786-F1 was ...rejected by the Warden because Plaintiff failed to sign the form with his committed name." Defendant's Opp. at Ex. 1 ¶ 6. 28 C.F.R. 542.14 (c)(4) specifically states that "The inmate shall date **and sign** the Request and submit it..." (emphasis added) It does not state, as the "Specialist" asserts, that the inmate shall date and sign "with his committed name." It does not state that the inmate shall date and "must sign your name correctly." It simply states that the inmate shall date and sign, and plaintiff undeniably did just that. Thus, defendant's rejection of Remedy I.D. # 354786-F1 was plain error.

Plaintiff, even though he had fulfilled all of his obligations, tried to give the defendant the benefit of the doubt. Leaving out the "AKA and Bro." mentioned in defendant's rejection notice, plaintiff retyped his entire Administrative Remedy and resubmitted the same issues on Thursday 10/14/04. Supp. Pl. at Remedy I.D. # 354786-R1. Plaintiff completed this second form with all requested identifying information and he dated and signed the Request in accordance with 28 C.F.R. § 542.14 (c)(3) & (4). This second submittal was given I.D. # 355510-F1 and it was rejected by the defendant on 10/20/04 for one reason; "You did not sign your Request or Appeal." Supp. Pl. at Remedy I.D. # 354786-R1, Attachment C.

The "Remarks" on this second rejection stated, "You must sign your name correctly (No alias, **only English** and no alternative dates, such as 42 A.D.)" (emphasis added) Id. The photocopy of Remedy I.D. # 355510-F1 that was submitted to this court by the plaintiff indisputably establishes that plaintiff's Request for Administrative Remedy was in fact signed. Supp. Pl. at Remedy I.D. # 355510-F1. Defendant's 10/20/04 "remarks" also prove that this submittal was signed at the time of filing. As aforesaid, 28 C.F.R. 542.14 (c)(4) does not state, as the defendant asserted, that the inmate shall date with "no alternative dates, such as 42 A.D." and sign "your name correctly (no alias, only English)." It simply states that the inmate shall date and sign, and plaintiff undeniably did just that. Consequently,

-11-

defendant's rejection of Remedy I.D. # 355510-F1 was also plain error.  Note that this remedy too was not rejected for any reason related to informal resolution.

Plaintiff sincerely believes that he must proclaim a holy or "religious name" to re-establish the cultural and religious links to his African ancestry that were destroyed during the course of the trans-Atlantic slave trade.  Plaintiff sincerely believes that his religious name must be proclaimed because it has been dictated by the ancient traditions and customs of the Ifa faith.  The use of plaintiff's religious name is "central" to his religious practice.  As established above, the defendant rejected plaintiff's remedies because of his use of both religious and committed names.  Knowing that these actions were clear violations of 28 C.F.R. § 542.11 (Responsibility) and 28 C.F.R. § 551.90 (Non-Discrimination), plaintiff appealed to the Regional Office.

According to BOP policy, mail pieces that exceed a certain weight must be submitted to Unit Counselors for forwarding.  Plaintiff's Regional Appeal package, because of its weight, had to be forwarded through his Unit Counselor and this appeal was submitted with the requisite BP-329 form on 10/21/04.  This appeal was held by BOP staff for seventy seven calendar days/fifty five working days before being forwarded.  The Regional Office rejected this appeal on 01/10/05 for being "untimely."  Appeals to the Regional Director must be received at the Regional Office within 20 calendar days of either the Warden's response or rejection.  28 C.F.R. §§ 542.15 (a) & 542.17 (c).  Defendant's "Specialist" would have the court to believe that this appeal was rejected because plaintiff "...did not resubmit the remedy to the Warden in a timely manner."  This is not the case.  Defendant rejected plaintiff's appeal because it did not arrive at the Regional Office within the 20 calendar days specified in policy.  This seventy seven calendar days delay was not the plaintiff's fault, but the defendant's.

Knowing that the defendant's "catch 22" maneuvers at the regional level were

also clear violations of 28 C.F.R. §§ 542.11 (Responsibility) and 551.90 (Non-Discrimination), plaintiff appealed to the Central Office. The General Counsel agreed with the Regional Office's plain error and likewise rejected plaintiff's final administrative appeal. Plaintiff, as dictated in the Prison Litigation Reform Act, sought relief at all available levels before filing this civil action. As a result, this case must proceed.

## V. Plaintiff has stated a cognizable RFRA claim.

Under RFRA, the government cannot substantially burden a person's exercise of religion. "Inadequately formulated prison regulations and policies grounded on mere speculation, exaggerated fears, or post-hoc rationalizations will not suffice to meet the [A]ct's requirements." S. Rep. No. 103-111. In order to state a claim under RFRA, a plaintiff must allege facts demonstrating that a sincerely held religious belief has been substantially burdened by government policies. Henderson v. Kennedy, 253 F.3d 12 (D.C. Cir. 2001). To show a substantial burden, "[t]he interference must be more than an inconvenience; the burden must be substantial and an interference with a tenet or belief to religious doctrine." Graham v. Commissioner of Internal Revenue Service, 822 F.2d 844, 850-51 (9th Cir. 1987), aff'd sub nom, Hernandez, supra. "A substantial burden constitutes 'putting substantial pressure on an adherent to modify his behavior and to violate his beliefs.'" Cockrell-El v. District of Columbia, 937 F.Supp. 18 (D.D.C., 1996) (quoting Hobbie v. Unemployment Appeals Comm'n of Fla., 480 U.S. 136, 141, 107 S.Ct. 1046, 1049, 94 L.Ed.2d 190 (1987)).

As stated above, plaintiff submitted his final draft of responses to defendant's New and Unfamiliar Religious Components Questionnaire in June of 2004. Attachment B of Plaintiff's Motion Requesting Permission to Supplement Original Pleading. These responses are a written statement of plaintiff's sincerely held religious beliefs. When these responses were submitted by the plaintiff, "Santeria" was

-13-

already approved as a recognized religion in the BOP. If "Santeria" or any offshoot of "Santeria" could have met plaintiff's religious needs, plaintiff's New and Unfamiliar Religious Components submittal would have been unwarranted. Because the "Santeria umbrella" was/is inadequate, BOP Staff Chaplain Phillip Williams instructed the plaintiff to complete a New and Unfamiliar Religious Components Questionnaire. After the submission of plaintiff's first draft of responses, Chaplain Williams instructed the the plaintiff to explain, in a revised submittal, the "difference between Santeria and Ifa." See Exhibit N. Plaintiff devoted an entire page to this question in his revised submittal. Attachment B of plaintiff's Request to Supplement page 11.

Both defendant's September 24, 2004, letter of approval and plaintiff's submittal incontestably indicate that the name of plaintiff's religion is Ifa. Even though plaintiff followed New and Unfamiliar Religious procedure to the letter, his religion, Ifa, was never implemented by the defendant. Plaintiff is being forced to worship "under the umbrella" of Santeria. See Exhibit O. In spite of defendant's letter approving plaintiff's religion, defendant's 2007 Standardized Chapel Library List does not include a category for Ifa. See Exhibit P. When plaintiff requested a copy of the approved religious items for his faith group, he was given a list of Santeria items. See Exhibit Q. The congregate religious items on this list include Holy Water (#3), Tiny bells (#7), Crucifix for group worship (#9), Statues of 11 different saints (#14), Deer's antler (#15), and Bibles (#29). These items, among others, do not have anything whatsoever to do with Ifa. All of the accommodations listed in the "Relief Requested" section of plaintiff's supplemental pleading have been denied the plaintiff since defendant's approval of his religion in 2004. The arbitrary and inconsistent unwritten rules that defendant has used to deny these accommodations, which are required for the practice of plaintiff's religion, violated, and

continue to violate RFRA.

Regarding defendant's claim that "plaintiff's religion, Ifaism, is oftentimes referred to as Yoruba or some facsimile of this name," it bears emphasizing that such misnomers are the product of ignorance. Defendant's Opp. at Footnote # 6. Yoruba is not the name of any religion, it is the name of a West African tribe and language. Furthermore, in the same manner that the Arabs of Saudi Arabia know the proper name of their indigenous religion, the Africans of Nigeria know the proper name of theirs. See Exhibit R, Article from "Tell"- Nigeria's Independent Weekly Newsmagazine. Hence, in addition to violating RFRA, defendant has insulted the plaintiff and degraded his religion.

## CONCLUSION

As the evidence presented herein has proven, there are no material facts in dispute between the parties and plaintiff is therefore entitled to summary judgment.

Respectfully submitted on this 12th day of October, 2007.

Ryan Pollard
(Shangowande Ajanaa-Werepe)
Plaintiff, pro se
Reg. # 06429-078
P.O. Box 26020
Beaumont, TX 77720-6020

**Exhibit A**

U.S. DEPARTMENT OF JUSTICE
FEDERAL BUREAU OF PRISONS

INCIDENT REPORT

| 1. NAME OF INSTITUTION: FCIM-BEAUMONT, TX | PART I - INCIDENT REPORT | 1317842 |
|---|---|---|

| 2. NAME OF INMATE: POULLARD, RYAN | 3. REGISTER NUMBER 06429-078 | 4. DATE OF INCIDENT: 03-03-05 | 5. TIME: 12:55 p.m. |
|---|---|---|---|

| 6. PLACE OF INCIDENT: RELIGIOUS SERVICES | 7. ASSIGNMENT: SAFETY | 8. UNIT: 8G2 017L |
|---|---|---|

| 9. INCIDENT: Failure to perform as instructed by the supervisor, Insolence towards a staff member | 10. CODE: 311,312 |
|---|---|

**11. Description of Incident** (Date: __03-03-05__  Time __12:55 p.m.__ _____ Staff became aware of incident)

At approximately 12:55am on March 3, 2005, while checking the Religious Service's faith group sign in sheets; it was observed that Ryan Poullard, Reg. No. 06429-078, did not sign-in as previously instructed under my supervision. ~~Mr. Poullard has been instructed to sign in with the official Bureau of Prisons name found on his BOP identification only. Mr. Poullard exhibits arrogance, contempt and disrespect towards staff for noncompliance.~~

| 12. SIGNATURE OF REPORTING EMPLOYEE: | DATE AND TIME: 03-03-05  1500 | 13. NAME AND TITLE (Printed): Jon Woods, Staff Chaplain |
|---|---|---|

| 14. INCIDENT REPORT DELIVERED TO ABOVE INMATE BY | 15. DATE INCIDENT REPORT DELIVERED 3/3/05 | 16. TIME INCIDENT REPORT DELIVERED 2155 |
|---|---|---|

PART II - COMMITTEE ACTION

17. COMMENTS OF INMATE TO COMMITTEE REGARDING ABOVE INCIDENT: _Inmate stated " the way I sign the sign in sheet is for religious reasons. In exercising my religious freedom I sign the sign in with my faith name._

| 18. A. IT IS THE FINDING OF THE COMMITTEE THAT YOU: X  COMMITTED THE FOLLOWING PROHIBITED ACT. ___ DID NOT COMMIT A PROHIBITED ACT. | B. ___ THE COMMITTEE IS REFERRING THE CHARGE(S) TO THE DHO FOR FURTHER HEARING C. ___ THE COMMITTEE ADVISED THE INMATE OF ITS FINDINGS AND OF THE RIGHT TO FILE AN APPEAL WITHIN 15 CALENDAR DAYS. |
|---|---|

19. COMMITTEE DECISION IS BASED ON THE FOLLOWING INFORMATION: _UDC Committee has found Inmate Poullard guilty for Failure to perform as instructed by supervisor based on the sign-in sheet. UDC doesn't find Inmate Poullard guilty of Insolence towards staff_

20. COMMITTEE ACTION AND/OR RECOMMENDATION IF REFERRED TO DHO (CONTINGENT UPON DHO FINDING INMATE COMMITTED PROHIBITED ACT): _UDC Committee will sanction Inmate with 10 hrs Extra duty to be completed by 5-23-05_

21. DATE AND TIME OF ACTION _3-8-05  742_  (THE UDC CHAIRMAN'S SIGNATURE NEXT TO HIS NAME CERTIFIES WHO SAT ON THE UDC AND THAT THE COMPLETED REPORT ACCURATELY REFLECTS THE UDC PROCEEDINGS.)

| _____ Chairman (Typed Name/Signature) | _R. Thomas_ Member (Typed Name) | _____ Member (Typed Name) |
|---|---|---|

Record Copy - Central File Record.  Copy - DHO.  Copy - Inmate after UDC Action.  Copy - Inmate Systems;  Copy - Inmate within 24 hours of Part I preparation

This form may be replicated via WP)        BP-S288.052                                    Replaces BP-288(52) of JAN 88

Exhibit B

```
   BMLG9         *           INMATE DISCIPLINE DATA          *        03-06-2006
   PAGE 001 OF 001 *   CHRONOLOGICAL DISCIPLINARY RECORD      *        08:14:00

   REGISTER NO: 06429-078 NAME..: POULLARD, RYAN EDWARD
   FUNCTION...: PRT        FORMAT: CHRONO     LIMIT TO     MOS PRIOR TO 03-06-2006

   ----------------------------------------------------------------------------
   REPORT NUMBER/STATUS.: 1317842 - SANCTIONED INCIDENT DATE/TIME: 03-03-2005 1255
   UDC HEARING DATE/TIME: 03-08-2005 1945
   FACL/UDC/CHAIRPERSON.: BML/SA/THOMAS
   REPORT REMARKS.......: 10 HOURS EXTRA DUTY
      311  FAILING TO WORK AS INSTRUCTED - FREQ: 1
           EXTRA DUTY / 10 HOURS / CS
           COMP:    LAW:    10 HOURS EXTRA DUTY




   G0005       TRANSACTION SUCCESSFULLY COMPLETED - CONTINUE PROCESSING IF DESIRED
```

**Exhibit C**

**25. —— Prison regulation, compelling governmental interest**

Prison's prohibition of personal property in prison yard did not place "substantial burden" on inmate's rights under First Amendment free exercise clause and Religious Freedom Restoration Act (RFRA), even though that policy prevented him from taking his Bible into prison yard; he was free to use his Bible in his cell in order to prepare for evangelism and counseling that he sought to do with assistance of his Bible in prison yard. Weir v. Nix, C.A.8 (Iowa) 1997, 114 F.3d 817. Civil Rights ☞ 135; Constitutional Law ☞ 84.5(14); Prisons ☞ 4(14)

Prison policy which required Islamic inmate who had legally changed his name while in prison to use both his legal name and name under which he was committed on all incoming and outgoing mail did not violate inmate's right to freely practice his religion under the RFRA; dual name requirement served compelling governmental interest of maintaining prison security, and requirement was least restrictive means of satisfying that interest. Fawaad v. Jones, C.A.11 (Ala.) 1996, 81 F.3d 1084. Constitutional Law ☞ 84.5(14); Prisons ☞ 4(14)

Prison officials had compelling interest in maintaining prison order by grouping religious denominations into four umbrella groups for purposes of festal occasions and, therefore, denial of request by prisoners of religious sect to hold banquet to celebrate birthday of their founder did not violate prisoners' rights under Religious Freedom Restoration Act (RFRA), in view of evidence that there were approximately 300 different religious sects at prison and that communal eating was standard rite for many of those sects. Mack v. O'Leary, C.A.7 (Ill.) 1996, 80 F.3d 1175, rehearing and suggestion for rehearing en banc denied, vacated 118 S.Ct. 36, 522 U.S. 801, 139 L.Ed.2d 5, on remand 151 F.3d 1033. Civil Rights ☞ 135

Although prison's interest in protecting against spread of tuberculosis was compelling, continued confinement of Rastafarian inmate who refused to submit to screening test for "latent" tuberculosis did not serve this interest, as required for government to justify substantial burden on inmate's right of free exercise of religion under Religious Freedom Restoration Act (RFRA); even if inmate were to

test and test positive and refuse to take medication, he would be placed with general prison population rather than in medical keeplock. Jolly v. Coughlin, S.D.(N.Y.) 1996, 76 F.3d 468. Constitutional Law ☞ 84.5(14); Prisons ☞ 17(2)

Prison regulations requiring inmate to be committed name, rather than religious name, on mail and documents impinged on inmate's rights under Religious Freedom Restoration Act (RFRA); state had legitimate interest in continued use of inmate's committed name, there was no legitimate penological interest in preventing inmates from using both religious and committed names. Malik v. Brown, C.A.9 (Wash.) 1995, 65 F.3d 148. Constitutional Law ☞ 84.5(14); Prisons ☞ 4(14)

Inmates failed to state claim that their religious rights were curtailed in violation of Religious Freedom Restoration Act (RFRA); in most cases right being violated was not articulated, and in one case, in which muslim inmate complained that Jumah service was allowed within individual tiers while religion requires that service involve single congregation of believers, there was compelling government requirement that order be maintained in crowded jail that overcame restriction on religious practice. Ingalls v. Florio, D.N.J.1997, 968 F.Supp. 193. Civil Rights ☞ 135

Prison officials' safety, security, and discipline concerns presented "compelling government interest" justifying hair length regulations challenged under Religious Freedom Restoration Act (RFRA); hair styles are used by inmates as gang identifiers and long hair provides hiding places for contraband such as drugs and weapons. Davie v. Wingard, S.D.Ohio 1997, 958 F.Supp. 1244, 166 A.L.R. Fed. 709. Civil Rights ☞ 135

Government officials impermissibly burdened pretrial detainees' right to exercise freely their religion in violation of Religious Freedom Restoration Act (RFRA), where officials failed to allow detainees to attend religious services and officers failed to proffer compelling reason for such failure. Carty v. Farrelly, D.Virgin Islands 1997, 957 F.Supp. 727. Prisons ☞ 4(14)

Muslim inmate who was prevented by correctional officer from attending weekly religious service had viable claim under First Amendment or Religious Free-

dom Restoration Act (RFRA), despite claim that preventing prisoner from attending congregate religious services once did not rise to level of constitutional violation; defendants asserted no reason, compelling or otherwise, as to why inmate was denied access to religious service. Harris v. Lord, S.D.N.Y.1997, 957 F.Supp. 471. Civil Rights ☞ 135; Constitutional Law ☞ 84.5(14); Prisons ☞ 4(14)

As a matter of law, giving due deference to prison administrators, concerns of Ohio Department of Rehabilitation and Corrections (ODRC) for safety and discipline within its corps of prison officers constituted "compelling" interest that was furthered by policy of requiring male uniformed employees to wear short hair, satisfying exception to prohibition, under Religious Freedom Restoration Act (RFRA), against government imposition of substantial burden on religious expression of adherent of Native American Spirituality. Blanken v. Ohio Dept. of Rehabilitation and Correction, S.D.Ohio 1996, 944 F.Supp. 1359. Civil Rights ☞ 151

While prison safety and security are compelling governmental interest within meaning of the Religious Freedom Restoration Act (RFRA), which precludes government from substantially burdening right to exercise religion unless it furthers compelling government interest and is least restrictive means of furthering that interest, prison officials cannot merely brandish the words "security" and "safety" and expect that their actions will automatically be deemed constitutionally permissible conduct. Ramirez v. Coughlin, N.D.N.Y.1996, 919 F.Supp. 617. Civil Rights ☞ 135

Prison security and penological institutional safety goals are compelling governmental interest necessary to support burden on exercise of religion under Religious Freedom Restoration Act (RFRA). Muhammad v. City of New York Dept. of Corrections, S.D.N.Y.1995, 904 F.Supp. 161, appeal dismissed 126 F.3d 119. Civil Rights ☞ 135; Constitutional Law ☞ 84.5(14)

Under Religious Freedom Restoration Act, government may not substantially burden person's exercise of religion unless burden is in furtherance of compelling governmental interest and is least restrictive means of furthering that compelling interest. Reimann v. Murphy,

Exhibit D

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

RYAN POULLARD,                    )
            Plaintiff,            )
                                  )
                                  )
    v.                            )        CIVIL ACTION 05-1768 D.D.C.
                                  )
                                  )
U.S. DEPARTMENT OF JUSTICE,       )
            Defendant.            )
_____)

## DECLARATION OF FRANCISCO QUINTANA

In accordance with 28 U.S.C. § 1746, I, FRANCISCO QUINTANA, make the following unsworn declaration, under penalty of perjury, pertinent to the above styled and numbered cause:

1.    I am Deputy Warden for the Federal Bureau of Prisons (BOP) at the Federal Correctional Complex, Low Security Institution, in Beaumont, Texas (FCC Beaumont-Low). I have been employed in this capacity since April 16, 2006.

2.    As Deputy Warden, I am responsible for the administrative and organizational control of Beaumont Low, which is part of the Beaumont Complex. The position of Warden requires exceptional managerial ability, a thorough knowledge of correctional programs, including religious ones, and the operation of correctional institutions, and an in-depth knowledge of the methods and techniques of inmate care and custody. The

Warden, in its exercise of discretion, may develop policies and programs at the local level which are consistent with the security of the institution and national policy.

3.    ~~As part of my duties as Deputy Warden, I have reviewed Beaumont's Low procedures~~ regarding inmates' use of their ~~religious names for official purposes.   At the FCC Beaumont Department Head meeting, held on October 31, 2006, staff was instructed that effective~~ immediately ~~inmates would be allowed to use their religious names for official purposes if used in conjunction with their committed names and inmate numbers.~~

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief. Executed on this 14th day of December, 2006.

Francisco Quintana
Deputy Warden
Beaumont Low

<u>**Exhibit E**</u>

**TO: POULLARD, RYAN**                     **FCC BEAUMONT (Low)**
**Reg. No#. 06429-078**
**Unit: SA**

**SUBJECT: Outdoor Worship Area**

This is in response to your Inmate Request to Staff dated May 2, 2007, where you ask why your religion is denied use of the Outdoor Worship Area.

~~An investigation to your complaint reveals your religion is accommodated under the umbrella of Santaria/Yoruba religion. There is no known requirements for use of the Outdoor Worship Area in Santaria/Yoruba.~~

Thank You,

James Watanabe, Chaplain

**Exhibit F**

BP-S148.055 **INMATE REQUEST TO STAFF** CDFRM
SEP 98

---

**U.S. DEPARTMENT OF JUSTICE**                    **FEDERAL BUREAU OF PRISONS**

| TO: (Name and Title of Staff Member) | DATE: |
|---|---|
| Chaplain Watanabe | 9/05/06 |
| FROM: Sàngówàndé Orìsà-nlá | REGISTER NO.: |
| Ryan Poullard | 06429-078 |
| WORK ASSIGNMENT: Rec. A.M. | UNIT: SA |

DG

SUBJECT: (Briefly state your question or concern and the solution you are requesting. Continue on back, if necessary. Your failure to be specific may result in no action being taken. If necessary, you will be interviewed in order to successfully respond to your request.)

When will the outdoor Ifá lodge materials + accommodations be made available to the members of the Ifá (misnomered "General Yoruban Program") faith group? Also, what will be the measurements and/or lay out for the thirteen approved outdoor shrines and dance + drumming area? A timely response would be greatly appreciated.

Thank you for your assistance.

(Do not write below this line)

Disposition:

We are working closely with Mr. Awoyefa on the outdoor worship area. I cannot give you a ~~time when it will be done, stat~~

| Signature Staff Member | Date: |
|---|---|
| | 9-6-06 |

Record Copy - File; Copy - Inmate          This form replaces BP-148.070 dated Oct. 86
(this form may be replicated via WP          BP-S148.070 APR 94

Exhibit G

**FEDERAL CORRECTIONAL COMPLEX, BEAUMONT, TEXAS**
**LOW SECURITY INSTITUTION**
**PART B - RESPONSE TO REQUEST FOR ADMINISTRATIVE REMEDY** 

This is in response to your Request for Administration Remedy
dated October 27, 2006, in which you state you must have two
meeting times and be allowed to observe Ifa holy days.  As
relief, you request two meeting times and be allowed to observe
Ifa holy days.

A review of your complaint, in consultation with subject matter
experts, reveal two meetings a week is not considered necessary
nor is it a community norm in Ifa.  Meeting once a week is
sufficient.  Also, the chaplain advises me the priest decides
when the Ifa holy day is observed.  He also assures me the
rituals will be performed once the date of the holy day is
determined.  ~~Lastly, the Outdoor Worship Area is available for
religious observances in accordance with policy~~.

Based on the above findings, your Request for Administrative
Remedy is denied.

If you are not satisfied with this decision, you may appeal to
the Regional Director at Bureau of Prisons, South Central Region,
4211 Cedar Springs Road, Suite 300, Dallas, Texas 75219.  Your
appeal must be received in the South Central Regional Office
within 20 days of the date of this response.

_____          __11-15-06__
Francisco J. Quintana, Deputy Warden     Date

**Exhibit H**

Submitted on this __6ᵗʰ__ day of January, 2007.

BMC 1330.13
[date]
Attachment, A

### Chaplain Watanabe

## DOCUMENTATION OF INFORMAL RESOLUTION ATTEMPT

Bureau of Prisons Program Statement No. 1330.13, <u>Administrative Remedy Program,</u> (Dec. 22, 1995), requires, in most cases, that inmates attempt informal resolution of grievances prior to filing a formal complaint. This form shall be used to document your efforts towards informally resolving your grievance.

Inmates Name: _Shangowande Orunmila_
_Ryan Poullard_ _____ Reg. No. __06429-078__ Unit, __SA__

Specific Complaint and Requested Relief:  To observe our Orunmila holy days, the members of the Ifa faith group requested chapel time and space for an "open to the compound" Ifa program and a "faith group only" prayer and meditation session.  We received neither. We were informed on 12/05/06 that the chaplain would do his best to accommodate us on 12/31, but his best was apparently the complete ignoring of our request. ~~We weren't even given access to an outdoor worship area so that our special prayers and offerings could be made on these days.~~  I don't know what kind of religious services department this institution is running but these brazen acts of discrimination must cease.  Please make sure that the members of the Ifa faith group are provided with chapel time and space for prayer and meditation on Wednesday 1/17/07 for our Shango holy days, and make arrangements for us to have the large chapel on Thursday 1/18/07 for an "open to the compound" Shango program. Several of our members have A.C.E. classes on 1/16/07, the first Shango holy day, so we would like our program to be held on 1/18/07. ~~Also, please provide us with the outdoor worship area that we need for daily prayers and offerings immediately.~~
(The 1/18/07 program will be from 6:00 PM to yard recall)

Thank you for your assistance.

---

Efforts Made By Inmate To Informally Resolve Grievance(Be Specific)

_____

_____

_____

_____

_____

_____

Counselor's Comments: _____

_____

_____

_____

_____

_____

_____

_____

**Exhibit I**

BP-S148.055  **INMATE REQUEST TO STAFF** CDFRM
SEP 98

**U.S. DEPARTMENT OF JUSTICE**                                    **FEDERAL BUREAU OF PRISONS**

| TO:(Name and Title of Staff Member) | DATE: |
|---|---|
| Chaplain Watanabe | 3/24/07 |
| FROM: Sangowánde Ajanaa-Werepe    Ryan Poullard | REGISTER NO.: 06429-078 |
| WORK ASSIGNMENT: REC AM | UNIT: SA |

SUBJECT: (Briefly state your question or concern and the solution you are requesting. Continue on back, if necessary.  Your failure to be specific may result in no action being taken.  If necessary, you will be interviewed in order to successfully respond to your request.)

For far too long, I have been requesting that the Ifa community's approval outdoor worship area be made available to our members for daily libations. Does this institution have some sort of Native Americans + Whites only policy on the provision of outdoor worship space? A speedy and clear response, and/or remedy, would be greatly appreciated.

Thank you.

(Do not write below this line)

DISPOSITION:

| Signature Staff Member | Date |
|---|---|
| | |

Record Copy - File; Copy - Inmate
(This form may be replicated via WP)

This form replaces BP-148.070 dated Oct 86 and BP-S148.070 APR 94

♲ Printed on Recycled Paper

**TO: POULLARD, RYAN**                    **FCC BEAUMONT (Low)**
**Reg. No#. 06429-078**
**Unit: SA**

**SUBJECT: Outdoor Worship Area**

This is in response to your Inmate Request to Staff dated March 24, 2007 in which you ask if this institution has "some sort of Native American and White only policy on the provision of outdoor worship space?"

~~The Bureau of Prisons follows applicable policies without regard to race, color, nationality, or ordinarily, creed.~~

Thank You,

James Watanabe, Chaplain

**Exhibit J**



**U.S. Department of Justice**

Federal Bureau of Prisons

*South Central Regional Office*

---

*4211 Cedar Springs Road, Suite 300*
*Dallas, Texas 75219*

~~September 24, 2004.~~


Mr. Reggie Harkey
Reg. No. 06844-078
P.O. Box 26020
Beaumont, Texas 77720-6020

Dear Mr. Harkey,

~~We have reviewed your request to introduce House of Yahweh at FCI~~
~~Beaumont (Low). After a thorough evaluation of your~~
~~documentation, we have approved your request.~~  The Warden may
make local decisions regarding the specific request of this
group, taking into consideration Bureau policy, supervision
capabilities, security interest, and the safe and orderly running
of the institution.

Sincerely,

*Matt H*

Matt Harness
Regional Chaplaincy Administrator


cc:  R. Childress, Warden
     FCI Beaumont (Low)

Exhibit K

# CHAPEL SCHEDULE/HORARIO DE LA CAPILLA

~~Effective January 26, 2005~~ Efectivo Enero 26, 2005

| | ACTIVITY/ACTIVIDAD | TIME/HORA | PLACE/LLIGAR |
|---|---|---|---|
| **SUN/DOM** | PROTESTANT SERVICE/SERVICIO PROTESTANTE | 08:00-09:30 AM | CHAPEL A/CAPILLA A |
| | MOORISH SCIENCE/CIENCIA DE LOS MOROS | 08:00-09:30 AM | CLASSROOM 1/SALON 1 |
| | CHURCH OF CHRIST/IGLESIA DE CRISTO | 12:30-01:30 PM | CLASSROOM 1/SALON 1 |
| | CATHOLIC ENG & SPN MASS/MISA CATOLICA | 12:30-01:30 PM | CHAPEL A/CAPILLA A |
| | MORMON/MORMON | 12:30-02:30 PM | PSYCH 1/PSIC 1 |
| | JEHOVAH'S WITNESS/TESTIGOS DE JEHOVA | 12:30-02:30 PM | CHAPEL B/CAPILLA B |
| | CATH. CHOIR PRACTICE/PRACTICA DEL CORO CATOLICO | 01:30-03:30 PM | CHAPEL A/CAPILLA A |
| | NAT. CIR. DRUM PRACTICE/PRACTICA DE TAMBOR NAT-AMER | 01:30-03:30 PM | OUTDOOR WORSHIP AREA |
| **MON/LUN** | SPN. GOSPEL SERVICE/SERVICIO DEL EVANGELIO ESPAÑOL | 06:30-08:30 PM | CHAPEL A/CAPILLA A |
| | NATION OF ISLAM/NACION DEL ISLAM | 06:30-08:30 PM | CLASSROOM 1/SALON 1 |
| | VIDEO TIME/TIEMPO 1 DE VIDEO | 06:30-08:30 PM | CHAPEL B/CAPILLA B |
| | BUDDHIST/BUDHISTA | 06:30-08:30 PM | CLASSROOM 2/SALON 2 |
| **TUE/MAR** | ENGLISH GOSPEL CHOIR/PRACTICA DEL CORO | 06:30-07:30 PM | CHAPEL A/CAPILLA A |
| | NATIVE CIRCLE STUDY/ESTUDIO DE CIRCULO NATIVO | 06:30-08:30 PM | CHAPEL B/CAPILLA B |
| | SPANISH BIBLE STUDY/ESTUDIO BIBLIA ESPAÑOL | 06:30-08:30 PM | CLASSROOM 1/SALON 1 |
| | WICCAN/WICCAN | 06:30-08:30 PM | CLASSROOM 2/SALON 2 |
| **WED/MIE** | CHURCH OF CHRIST BIBLE STUDY/ESTUDIO IGLESIA DE CRISTO | 08:30-10:30 AM | CHAPEL B/CAPILLA B |
| | CATHOLIC DOCTRINE/DOCTRINA CATOLICA | 06:30-08:30 PM | CHAPEL A/CAPILLA A |
| | ISLAMIC TEACHINGS/ ENSEÑANZAS ISLAMICAS | 06:30-08:30 PM | CHAPEL B/CAPILLA B |
| | BUDDHIST/BUDHISTA | 06:30-08:30 PM | CLASSROOM 1/SALON 1 |
| | RASTAFARIANS/ RASTAFARIANOS | 06:30-08:30 PM | CLASSROOM 2/SALON 2 |
| **THU/JUE** | CHAPEL MAINTENANCE / MANTENIMIENTO DE LA CAPILLA | 12:30-02:30 PM | CHAPEL A/CAPILLA A |
| | JEHOVAH'S WITNESS/TESTIGOS DE JEHOVA | 12:30-02:30 PM | CHAPEL B/CAPILLA B |
| | PROTESTANT BIBLE STUDY/ESTUDIO PROTESTANTE | 12:30-02:30 PM | CLASSROOM 1/SALON 1 |
| | LIFE CONNECTIONS/ CONECCIONES DE VIDA (1st Thursday of each month) | 02:30-03:30 PM | CLASSROOM 2/SALON 2 |
| **FRI/VIE** | JUMAH PRAYER/ORACION JUMAH | 12:30-02:30 PM | CHAPEL B/CAPILLA B |
| | NATION OF ISLAM/NACION DEL ISLAM | 12:30-02:30 PM | CHAPEL A/CAPILLA A |
| | MOORISH SCIENCE/CIENCIA DE LOS MOROS | 12:30-02:30 PM | CLASSROOM 1/SALON 1 |
| | JEWISH SERVICE/SERVICIO JUDIO | 06:30-08:30 PM | CLASSROOM 1/SALON 1 |
| **SAT/SAB** | CATHOLIC ROSARY/ROSARIO CATOLICO | 08:00-09:30 AM | CHAPEL A/CAPILLA A |
| | 7th DAY ADVENTIST/ADVENTISTA DEL 7 DIA | 08:00-09:30 AM | CHAPEL B/CAPILLA B |
| | JEWISH SERVICE/SERVICIO JUDIO | 08:00-09:30 AM | CLASSROOM 1/SALON 1 |
| | NATIVE AMERICAN SWEAT LODGE/ALOJAMIENTO DE ORACION | 11:00 AM-02:30 PM | OUTDOOR WORSHIP AREA |
| | RASTAFARIANS/ RASTAFARIANOS | 12:30-02:30 PM | CHAPEL B/CAPILLA B |
| | ~~HOUSE OF YAHWEH~~/CASA DE YAHWEH | 12:30-02:30 PM | CLASSROOM 1/SALON 1 |
| | SPANISH GOSPEL CHOIR/CORO DEL EVANGELIO ESPAÑOL | 12:30-02:30 PM | CHAPEL A/CAPILLA A |

Program schedule may change / El Programa del horario puede cambiar

Only scheduled programs are authorized to meet/Solamente programas in el horario son permitidas reunirse

CHAPLAIN J. WOODS SCHEDULE/HORARIO: 07:30 A.M.-4:00 P.M. SUN, WED, THU, 12:30-9:00 P.M. MON, TUE
COUNSELOR K. WHEAT'S SCHEDULE/HORARIO: 07:30 A.M.-4:00 P.M. TUE, THU, SAT, 12:30-9:00 P.M. WED, FRI
CHAPLAIN M. PRAYTOR, SUPERVISORY CHAPLAIN FCC BEAUMONT/ Office located at USP Beaumont

APPROVED _____ / T. HOLLINGSWORTH, ASSOCIATE WARDEN (1 &E)

Exhibit L



**U.S. Department of Justice**

*Federal Bureau of Prisons*

*FCC Beaumont (Low)*                    *Beaumont, Texas 77720*

March 6, 2005

MEMORANDUM FOR INMATE POPULATION/POPULACION DE INTERNOS

FROM:            Jon Woods, Staff Chaplain

SUBJECT:         Chapel Schedule Change/Cambio Del Horario De Capilla

On Sunday, March 13, 2005, the revised schedule of religious programing will take effect. Please note the changes and make arrangements for placement on the call-out list if necessary.

El Domingo 13 De Marzo, 2005, el horario revisado de la programacion religiosa tomara efecto. Por favor tome nota de los cambios y haga arreglos para ser puesto en la lista del "call-out" si es necesario.

## CHAPEL SCHEDULE/HORARIO DE LA CAPILLA

Efectivo Marzo 13, 2005

| | ACTIVITY/ACTIVIDAD | TIME/HORA | PLACE/LUGAR |
|---|---|---|---|
| SUN/DOM | PROTESTANT SERVICE/SERVICIO PROTESTANTE | 08:30-09:30 AM | CHAPEL A/CAPILLA A |
| | CATHOLIC MASS/MISA CATOLICA | 12:30-01:30 PM | CHAPEL A/CAPILLA A |
| | MORMON/MORMON | 01:30-02:30 PM | CLASSROOM 1/SALON 1 |
| | JEHOVAH'S WITNESS/TESTIGOS DE JEHOVA | 01:30-02:30 PM | CHAPEL B/CAPILLA B |
| | CHURCH OF CHRIST/IGLESIA DE CRISTO | 02:30-03:30 PM | CLASSROOM 1/SALON 1 |
| MON/LUN | SPN. GOSPEL SERVICE/SERVICIO DEL EVANGELIO ESPANOL | 06:30-07:30 PM | CHAPEL A/CAPILLA A |
| | VIDEO TIME /TIEMPO DE VIDEO | 06:30-08:30 PM | CHAPEL B/CAPILLA B |
| | BUDDHIST/BUDHISTA | 07:30-08:30 PM | CLASSROOM 1/SALON 1 |
| TUE/MAR | CHOIR PRACTICE/PRACTICA DEL CORO | 06:30-07:30 PM | CHAPEL A/CAPILLA A |
| | WICCAN/WICCAN | 07:30-08:30 PM | CLASSROOM 1/SALON 1 |
| WED/MIE | THE PURPOSE DRIVEN LIFE/UNA VIDA CONDUCIDA CON PROPOSITO | 06:30-07:30 PM | CHAPEL A/CAPILLA A |
| | GENERAL YORUBAN PROGRAM/PROGRAMA YORUBAN GENERAL | 07:30-08:30 PM | CLASSROOM 1/SALON 1 |
| THU/JUE | ADMISSIONS AND ORIENTATION/ADMISION Y ORIENTACION | 08:00 AM-01:30 PM | CHAPEL A/CAPILLA A |
| | LIFE CONNECTIONS/ CONECCIONES DE VIDA (1ᵗ Thursday of each month) | 12:30-01:30 PM | CLASSROOM 1/SALON 1 |
| | NATIVE AMERICAN SWEAT LODGE/ALOJAMIENTO DE ORACION | 01:30-03:30 PM | OUTDOOR WORSHIP AREA |
| FRI/VIE | JUMAH PRAYER/ORACION JUMAH | 12:30-01:30 PM | CHAPEL B/CAPILLA B |
| | NATION OF ISLAM/NACION DEL ISLAM | 01:30-02:30 PM | CHAPEL A/CAPILLA A |
| | JEWISH SERVICE/SERVICIO JUDIO | 06:30-07:30 PM | CLASSROOM 1/SALON 1 |
| | MOORISH SCIENCE/CIENCIA DE LOS MOROS | 06:30-07:30 PM | CLASSROOM 1/SALON 1 |
| SAT/SAB | JEWISH SERVICE/SERVICEO JUDIO | 08:30-09:30 AM | CHAPEL B/CAPILLA B |
| | 7ᵗʰ DAY AVENTIST/ADVENTISTA DEL 7 DIA | 08:30-09:30 AM | CLASSROOM 1/SALON 1 |
| | HOUSE OF YAHWEH/CASA DE YAHWEH | 12:30-01:30 PM | CLASSROOM 1/SALON 1 |
| | RASTAFARIANS/ RASTAFARIANOS | 01:30-02:30 PM | CLASSROOM 1/SALON 1 |

Program schedule may change without notice/El programa del horario puede cambiar
Only authorized programs will meet /Solamente programas autorizados se reuniran

CHAPLAIN J. WOODS SCHEDULE/HORARIO: 07:30 A.M.-4:00 P.M. SUN, WED, THU; 12:30-9:00 P.M. MON, TUE
COUNSELOR K. WHEAT'S SCHEDULE/HORARIO: 07:30 A.M.-4:00 P.M. TUE, THU, FRI, SAT; 12:30-9:00 P.M. WED
CHAPLAIN M. PRAYTOR, SUPERVISORY CHAPLAIN FCC BEAUMONT, Office located at USP Beaumont

APPROVED: _____
                          J. HOLLINGSWORTH, ASSOCIATE WARDEN (I &E)

**Exhibit M**



**U.S. Department of Justice**
Federal Bureau of Prisons

# Program Statement

Reformatted to renumber pages and
remove CN notations from chapters
4/2/07.

**OPI:** OGC
**NUMBER:** 1330.13
**DATE:** 8/13/2002
**SUBJECT:** ~~Administrative Remedy~~

**RULES EFFECTIVE DATE:** 8/6/2002

1. [**PURPOSE AND SCOPE** §542.10

   **a.** **Purpose.**  The purpose of the Administrative Remedy Program
is to allow an inmate to seek formal review of an issue relating
to any aspect of his/her own confinement.  An inmate may not
submit a Request or Appeal on behalf of another inmate.

   **b.** **Scope.**  This Program applies to all inmates in institutions
operated by the Bureau of Prisons, to inmates designated to
contract Community Corrections Centers (CCCs) under Bureau of
Prisons responsibility, and to former inmates for issues that
arose during their confinement.  This Program does not apply to
inmates confined in other non-federal facilities.]

   The president of a recognized inmate organization may submit a
request on behalf of that organization regarding an issue that
specifically affects that organization.

   [**c.** **Statutorily-mandated Procedures.**  There are statutorily-
mandated procedures in place for Tort claims (28 CFR 543, subpart
C), Inmate Accident Compensation claims (28 CFR 301), and Freedom
of Information Act or Privacy Act requests (28 CFR 513, subpart
D).  If an inmate raises an issue in a request or appeal that
cannot be resolved through the Administrative Remedy Program, the
Bureau will refer the inmate to the appropriate statutorily-
mandated procedures.]

2. **PROGRAM OBJECTIVES.**  The expected results of this program
are:

   a.  A procedure will be available by which inmates will be able
to have any issue related to their incarceration formally
reviewed by high-level Bureau officials.

**Exhibit N**

Mrs Poullard,

Very Good submission.

- Explain more on the highlighted items.
- under #10

- Which items are inmate personal religious property & which ones are congregational religious property.

- Do all participants use the same head wear? (#9)

- Are all of the items in #10 go purchaseable from a vendor? Do you have a $ catalog?

- Why are some crossed out highlighted, some not, and some deleted?
- old is different between Santeria & + fa?
- When When would candles be burned? Incense, 13A

- Sactifies? Attachment #10A Knives

- What is a babalawos? Yoruba scientist, doctor, & high priest. Literally translates into English as Father of the secrets.

- How will you practice w/out a teacher?

- Attachment # 11 sword, Ax,

- NEEDS TYPED

Exhibit O

**TO: POULLARD, RYAN**                        **FCC BEAUMONT (Low)**
**Reg. No#. 06429-078**
**Unit: SA**

**SUBJECT: Ceremonial Meal**

~~This is in response to your Inmate Request to Staff dated December 26, 2006 in which you request ▓▓▓▓▓▓▓▓▓▓▓▓▓for the upcoming ceremonial meal.~~ Also, you request a justification for the foods that were purchased.~~ Lastly you request the meal to be rescheduled to July.

~~An investigation to your requests reveal the following.  Under the Santaria/Yoruban umbrella of religions,  fish is considered a perfectly acceptable  traditional food.  Since fish is acceptable to the Santaria/Yourban faith groups, the ceremonial meal will be conducted as planned.~~

Thank You,

James Watanabe, Chaplain

Received at 7:59 AM
on 1/08/07

Ryan Poullard a/k/a
Sàngówándé Orúnmilà

**Exhibit P**

# Standardized Chapel Library List



## Federal Bureau of Prisons

*Spring 2007*

Standard Chapel Library List Categories

Baha'i

Buddhism

Catholic

General

General Christian

General Spirituality and Interfaith

Hindu

Islam

Jehovah's Witnesses

Judaism

Messianic / Sabbatarian

Mormon

Nation of Islam / MST of A

Native American

Orthodox

Pagan

Rastafarian

~~Santeria / Yoruban~~

Sikh

Exhibit Q

RELIGIOUS ITEMS FOR YORUBA/SANTARIA

## A. PERSONAL RELIGIOUS ITEMS
1. Beaded necklace
2. Tarot Cards
3. Amulet
4. Straw mats

## B. CONGREGATE (GROUP) RELIGIOUS ITEMS
1. Dried hollow gourd shells
2. Powdered eggs
3. Holy water
4. Candles
5. Coconut wooden staff
6. Colored ribbons
7. Tiny bells
8. Cigar (to be placed on the alter, but not smoked)
9. Crucifix for group worship
10. Nine glass cups
11. Ornumilla's board
12. Cowrie shells
13. Grape juice
14. Statues of 11 different saints (orishas)
15. Deer's antlers
16. Ornumilla's blessing powder
17. Fruits
18. Flowers
19. Coconut
20. Incense charcoal
21. Bird feathers
22. Rocks
23. Dried beans
24. Straw matt
25. Sea shells
26. tarot cards
27. cocoa butter
28. Music
29. Bibles
30 drums

**Exhibit R**

**Religion**

# Celebrating Ifa Religion

**The 29th annual Ifa thanksgiving ceremony, organised by Idowu Odeyemi, professor of Applied Geology, was celebrated with pomp in Ilawe Ekiti, Ekiti State**

By ADEKUNLE YUSUF



Odeyemi:
*Satisfied*

The sprawling residential edifice on the outskirts of the ancient town of Ilawe Ekiti, Ekiti State, is impeccably white. But observers say it is a symbol that is not incongruous with the faith and purity of souls of its occupants, including those of obviously over-joyous guests streaming into it for a yearly function that sultry afternoon. And for the past 29 years, this palatial home has been a mecca of sort to traditionalists whose annual calendar is not complete if they do not spend three days there. This year's version was not devoid of the glamour of previous ones.

Evidently, the ethereal spirits, judging by the mien of the cream of renowned Ifa believers that thronged the expansive yard, were hungry for supplications. And the calibre of ~~the adherents~~ that were on hand seemed to be equal to the task. Enrobed resplendently in motley attire and chanting various *ese* Ifa, praises of the god of divination, as they strolled into the kingly mansion, worshippers who had defied the biting fuel scarcity to converge from all walks of life to fellowship with one of their own danced to the melodious percussion wafting from the drums of cultural troupes that were on hand to infuse life and traditional essence to the event. That set the tone for the programme. And throughout the three-day annual festival organised by Idowu Odeyemi, professor of Applied Geology and president, International Council for ~~the Religion~~ festivity and conviviality swirled in the horizon.

On the first day, after hot exchange of banter lightened by heavy refreshments, the worshippers wore a more businesslike mood, relocating to a section of the house



An Ifa priest consults Olodumare

where Ifa was cleansed overnight, that is, offering thanks in the form of propitiation or sacrifice to the Supreme Being for sparing their lives, particularly those of the Odeyemi family throughout the just expired year and for bringing last year's predictions and promises to fruition. It was, however, festivity galore on the second day, which was made more splendid by Egigun Elewe Cultural Group, led by Bamidele Arifajogun from Ila Orangun, Osun State. In the air of frenzy, everyone ate and drank to satiety before an open Ifa divination was cast on the third and final day where questions bordering on personal, local, national and international affairs were raised for Ifa to tackle and solutions proffered.

Bifatife Adeseye, an ~~Ifa priest~~ and lecturer, Department of Theatre Arts, Delta State University, Abraka, Delta State, said the annual thanksgiving meant a lot to believers who not only utilise the opportunity of happy reunion with fellow renowned priests from all parts of the world to advance their spiritualism but also as a way of reconnecting with the Supreme Being and showing gratitude for His mercies. "I am proud to be here this year again to meet eminent faithful. I pray to be here again next year with my entire family to give thanks to *Olodumare* for keeping us alive," Adeseye said.

Addressing the crowd of worshippers at the event, Odeyemi expressed satisfaction with the love and camaraderie his co-believers have shown him. The annual thanksgiving was incorporated into an annual ritual as Odeyemi beseeched *Olodumare* to open the eyes of all to the beauty of a religion which, he believes, would still govern the world. ∎